Molzoff, Appellant, vs. Chicago, Milwaukee & St. Paul Railway Company, Respondent.

*February 1—February 22, 1916.*

*Railroads: Injury to employee on track: Negligence: Questions for jury: Liability under federal statute.*

1. In an action under the federal Employers' Liability Act it appeared that plaintiff, in the discharge of his duties as an employee of the defendant railway company, was returning from the west to the east side of a river and, as he frequently did, was riding on the footboard of a switch engine. The engine stopped before reaching a railway bridge over the river and plaintiff proceeded to walk over a trestle which formed the western end of

the bridge. While he was on the trestle the engine started again and struck and injured him. Many of defendant's employees were accustomed to cross the bridge in going to and from their work. Upon these facts, and upon evidence from which the jury might have found that plaintiff rode upon the footboard with the knowledge of the fireman and engineer; that either of them could have seen him on the trestle before the engine started, had they looked; that ordinary care and a rule of the defendant required the ringing of the bell or blowing of the whistle before starting the engine after it had stopped near the trestle; that neither of such signals was given; that a brakeman who was riding with plaintiff on the footboard until the engine stopped told him that it would go no further; and that plaintiff relied upon such statement,—it was error to direct a verdict for defendant.

2. The action being under the federal statute, it was not necessary to prove that the negligence of defendant's employees was the proximate cause of the injury, but only that the injury resulted in whole or in part from such negligence.

APPEAL from a judgment of the circuit court for Brown county: HENRY GRAASS, Circuit Judge. *Reversed.*

This action was brought to recover for personal injuries sustained by plaintiff while in the service of the defendant. After the evidence was in the court below directed a verdict for defendant. Judgment was entered accordingly dismissing the complaint, from which judgment this appeal was taken.

For the appellant there were briefs by *Charles K. Bong,* attorney, and *Victor I. Minahan,* of counsel, and oral argument by *Mr. Minahan.*

For the respondent there was a brief by *Greene, Fairchild, North, Parker & McGillan,* attorneys, and *Chas. H. Van Alstine* and *H. J. Killilea,* of counsel, and oral argument by *H. O. Fairchild.*

KERWIN, J. Briefly stated, the negligence complained of is that the plaintiff was a "yard man" in the employ of the defendant, and that it was the duty of defendant to furnish a safe place for plaintiff to work and warn him of dangers

arising out of the course of his employment; that defendant failed in its duty, and in consequence plaintiff was seriously injured; that on July 21, 1914, plaintiff, in the course of his duty as employee of defendant, was returning from the round-house of defendant on the track and bridge of defendant, and through the negligence of defendant was run down and struck by an engine operated by defendant's employees.

The particular negligence complained of is that the engine bell was not sounded so as to give plaintiff notice of the approach of the engine; that the engine was moved after it had come to a complete stop without any lookout to see whether any person was in a place of danger; and that plaintiff was misinformed as to the movements of the engine by a member of the switching crew, which information was relied upon by him.

The questions involved are mainly questions of fact, namely, whether there was sufficient evidence to carry the case to the jury on the defendant's alleged negligence.

It is conceded that the case comes under the federal act. The evidence tends to show that the defendant maintains its depot and depot grounds on the east side of the city of Green Bay, Wisconsin, and also a small switching yard there; on the west side of Green Bay it maintains large shops and extensive switching yards; there is a railroad bridge across the Fox river connecting these two yards; the bridge consists of a trestle at the west side of the river about 290 feet in length; there is no pathway on this trestle, but upon each side, about two feet below the level of the ties, is a stringer upon which a person may stand in safety while a train is passing; the bridge proper is built upon wooden piers and said piers are so constructed that it is practicable for a person crossing the bridge to stand thereon in safety while a train is passing. The main line of the company runs over this bridge, and about 300 feet west of the westerly approach is what is known as the Green Bay and Kewaunee Y, which is a switch con-

necting the defendant's line with the lines of the Green Bay
& Western and Kewaunee, Green Bay & Western Railroad
Companies. The duties of the plaintiff were mainly on the
east side of the river, but he was frequently required to go
across the bridge to the west side on errands of different
kinds, such as carrying tools over to the shops on the west
side to be sharpened or repaired. There is evidence that it
was customary for the "boss" to send plaintiff over sometimes
every day and sometimes twice a day, and that plaintiff was
accustomed to ride upon the engine going back and forth,
with the knowledge of employees operating the engine; that
upon the day in question plaintiff was sent to the west side
with some tools to be sharpened; that he rode in the caboose,
delivered the tools at the shop, and was to call for them the
next day; that he saw an engine at the water tank and was
told by one of the brakemen in charge that it was going east
over the river; that the engine was backing up, dragging
some fourteen or fifteen cars; that the train crew consisted of
a fireman, engineer, and three brakemen; that just before the
engine started the plaintiff spoke to the fireman and engineer,
then got on the footboard with the three brakemen and rode
from the west yard over to the Green Bay Y, a distance of
about one half mile; that one of the brakemen got off shortly
before the engine reached the Green Bay Y, another got off
at the Y, and the third rode with plaintiff until the engine
stopped at or near the trestle. The evidence varies as to the
exact distance from the trestle, some witnesses putting it at
forty-two feet west of the beginning of the trestle and others
at the beginning of the trestle. The brakeman who re-
mained on the footboard until the engine stopped at the tres-
tle then got off and said to plaintiff, "Mike, we don't go any
further, we are going to do some work on the Green Bay Y."
The plaintiff testified that he assumed that the switching
would take considerable time, an hour or so, and proceeded to
walk east over the bridge. After he had walked some dis-

tance on the trestle (the evidence varying as to the distance, some witnesses putting it at forty-two feet, others at as high as 120 feet) the engine started east and struck plaintiff, causing the injuries complained of. Plaintiff did not hear the engine approaching until it was quite close to him,—he says about eighteen or twenty feet from him; that it was coming quite fast, and he became panic-stricken and ran from one side of the track to the other a couple of times until the engine struck him; that he went only about ten feet after he saw the engine and began to run before he was struck.

It further appears from the evidence that a large number of employees engaged in the shops and in the employ of the defendant were accustomed to cross the bridge in going to and from their work at different hours of the day, and that plaintiff was accustomed to ride back to the east side upon switch engines when returning from the west side while in the discharge of his duties as employee of the defendant. That sometimes plaintiff walked across the bridge in going to and from the shops on the west side.

There is no direct evidence that the engineer or fireman knew that plaintiff rode on the footboard or that he got off at the bridge on the day in question, but in view of all the circumstances of the case we think the jury would have been entitled to find that the fireman and engineer knew, or ought to have known, that he was riding on the footboard on his way over the river to his work on the east side.

The evidence is conflicting as to whether or not the bell was rung before starting onto the bridge after plaintiff got off the footboard, but upon this point the evidence is also sufficient to warrant the jury in finding that the bell did not ring, or that if it did ring it was only a low, muffled stroke and not sufficient to give warning. Counsel for respondent contends, first, that the bell was rung, and second, that it was not negligence on the part of the defendant to fail to ring the bell where the engine stopped only a few seconds. The evi-

dence is conflicting as to how long the engine stopped, vary-
ing from a couple of seconds to about a minute.    There is
also evidence that it is always necessary and customary be-
fore starting an engine to give the signal either by ringing the
bell or blowing the whistle, unless it be known to the person
operating the engine that no one is in danger.    There is evi-
dence on the part of the defendant that the engineer and fire-
man looked east before starting onto the bridge and did not
see plaintiff, and that in view of his distance from the en-
gine, some evidence showing it was only about forty-two feet,
he could not be seen; while on the part of the plaintiff there
is evidence to the effect that neither the fireman nor the en-
gineer looked, but were facing the switch, west, and did not
look upon the bridge before the engine started, and that if
they had looked they could have seen plaintiff.

There is also evidence in the case that under the rules of
the defendant the person in charge of an engine upon moving
it is bound to give a signal either by blowing the whistle or
ringing the bell.

There is also evidence that the plaintiff was more than
sixty feet away from the engine at the time it started, and
that at this point he could be seen by the engineer and fire-
man, or either of them, had they looked.

We shall not attempt to discuss the evidence in detail on
the question of negligence.    We think it was sufficient to en-
title the jury to find that the plaintiff rode upon the footboard
with the knowledge of the fireman and engineer, and that
either of them looking could have seen him on the bridge be-
fore the engine started; that under the circumstances of the
case ordinary care required that the bell should have been
rung or the whistle blown before starting the engine, and that
neither was done; that the brakeman who remained upon the
footboard with plaintiff until the engine stopped made the
statement that the engine would go no further, and that
plaintiff relied upon this statement.

The starting of the engine without signal, warning, or lookout, under the circumstances detailed by the evidence, would constitute negligence regardless of the question whether the misinformation given by the brakeman Patterson alone was sufficient. The case of *Skaggs v. Ill. Cent. R. Co.* 124 Minn. 503, 145 N. W. 381, seems to support the contention of appellant that such misinformation, relied upon, constitutes negligence.

It is contended by counsel for respondent that in any event the alleged negligence was not the proximate cause of the injury. Under the federal act it is sufficient if the injury to an employee results in whole or in part from the negligence of any of the officers, agents, or employees of the common carrier. Act of April 22, 1908 (35 U. S. Stats. at Large, 65, ch. 149, sec. 1). It is insisted by counsel for respondent that plaintiff knew the engine was going to "back up" because he so stated to the brakeman, and that this was sufficient warning. It is by no means clear that plaintiff knew that the engine was going to back up or that he understood the engine was going east onto the trestle. His acts in going on the bridge in front of it would indicate that he did not, and he so testified. The engine was going east, dragging cars after it, until it reached the trestle. The plaintiff may well have understood that by "backing up" it was intended that the engine would go west in the opposite direction from that it had been going up to the time it stopped at the trestle. It was for the jury to say whether such statement, if made, was sufficient warning.

Counsel also relies upon *St. Louis & S. F. R. Co. v. Conarty,* 238 U. S. 243, 35 Sup. Ct. 785. This case is not favorable to plaintiff. It did not arise under the federal act above referred to, but under the Safety Appliance Act of April 14, 1910 (36 U. S. Stats. at Large, 298, ch. 160, 1 Fed. Stats. Ann. (1912 Supp.) sec. 2, p. 336). The Safety Appliance Act was passed to protect a certain class, and the

court held in the *Conarty Case, supra,* that the deceased was not "within the class of persons for whose benefit the Safety Appliance Act required that the car be equipped with automatic couplers and drawbars of standard height."

A careful review of all the evidence convinces the court that there was ample evidence to carry the case to the jury and therefore the court below was in error in directing a verdict for the defendant.

*By the Court.*—The judgment is reversed, and the cause remanded for a new trial.